ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
OCT - 4 2006
U.S. COURT OF FEDERAL CLAIMS

LOCKHEED MARTIN CORPORATION,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

No. 06-688 C

COMPLAINT

Plaintiff Lockheed Martin Corporation ("Lockheed Martin"), for its complaint against defendant, alleges as follows:

THE PARTIES

1. Plaintiff Lockheed Martin is a Maryland corporation with its headquarters in Bethesda, Maryland.

2. Defendant is the United States of America ("United States" or "Government").

JURISDICTION

3. This is a civil action brought by Plaintiff Lockheed Martin against the United States pursuant to Section 10 of the Contract Disputes Act of 1978, 41 U.S.C. § 609, and the Tucker Act, 28 U.S.C. § 1491.

4. This action is an appeal from a July 24, 2006 final decision ("Final Decision") (Attachment B) by the United States denying a May 31, 2006 claim ("Claim") (Attachment A) by Lockheed Martin seeking the sum certain amount of $4,108,250.00, plus interest for the loss incurred by Lockheed Martin on the disposition of two Cray supercomputers in 1995.

5. Lockheed Martin timely appeals from the July 24, 2006 Final Decision in accordance with 41 U.S.C. § 609(a)(1).

## STATEMENT OF FACTS

6. In 1992, Lockheed Corporation formed the Lockheed Information Technology Company ("LITC") as a wholly owned subsidiary in Denver, Colorado. For the purposes of achieving Corporate-wide cost savings, Lockheed centralized data processing services and information technology resources at LITC, including Cray computer resources.

7. To support forecasted demand, LITC acquired two Cray supercomputers with an investment value of approximately $18.2 million.

8. In September 1995, DCAA noted that "a significant reduction in the [Cray computer] usage . . . resulted in excess computing capacity" and recommended that Lockheed Martin dispose of one or both of the Cray computers:

> We recommend that LITC reduce costs charged to Government contracts by eliminating excess computing capacity using either Scenario 2 or Scenario 3 (i.e. eliminating one or both of the Cray computers). There is no material difference in cost avoidance between the two scenarios. Therefore, the selected alternative should be based on considerations other than cost.

September 29, 1995 Draft Audit Report No. 03121-95J10501001.

9. DCAA also recognized that the "sudden excess Cray Computer capacity" was due to the following factors beyond Lockheed Martin's control:

> (1) the overall decline in the defense industry, (2) changes in the method of recovering computer cost and (3) fund shortfalls in some anticipated programs.

September 29, 1995 Draft Audit Report No. 03121-95J10501001.

10. In direct response to DCAA's recommendation, in December 1995, Lockheed Martin sold the two Cray computers back to Cray Research, Inc. Because Lockheed Martin disposed of the Cray computers before the end of their normal service life, their disposition resulted in an unanticipated loss of $6,810,423.94.

11. By letter dated January 17, 1996, Lockheed Martin informed the Government that the Company had adopted DCAA's recommendation and disposed of the two Cray computers.

12. On March 16, 2000, Lockheed Martin appealed a final decision of the contracting officer related to Cray computer costs to this Court. *Lockheed Martin v. United States*, No. 00-129 C.

13. Lockheed Martin believed that all costs related to the Cray computers, including the Company's 1995 loss on the disposition of the Cray computers, were in dispute and were part of the litigation in *Lockheed Martin v. United States*, No. 00-129 C.

14. In December 2001, Lockheed Martin and the Government determined that Corporate direct and indirect costs for 1995 could be settled as part of a Corporate Final Incurred Costs Settlement Agreement for Fiscal Year 1995 ("Settlement Agreement") even though litigation and significant disagreement existed regarding Cray computer costs. The Settlement

Agreement provided: "This settlement in no way affects the dispute concerning Cray costs, which is currently being litigated."

15. Lockheed Martin believed that the reservation in the Settlement Agreement preserved the Company's right to seek costs associated with the loss on the disposition of the Cray computers.

16. At the time the Government executed the Settlement Agreement in December 2001, the Government knew that Lockheed Martin considered the 1995 loss on disposition of the Cray computers as an issue being litigated in Case No. 00-129 C. Indeed, in October 2001 in connection with Case No. 00-129 C, Lockheed Martin provided the Government with a schedule entitled "Cost Impact Conclusion." This schedule included Lockheed's estimate at that time of the loss on the disposition of the Cray computers.

17. In an April 2002 presentation to the Government, Lockheed Martin reiterated its understanding that resolution of Case No. 00-129 C required the consideration of "Total Cray Costs."

18. Lockheed Martin vigorously litigated the issue of whether the loss the Company incurred on disposition of the Cray computers was subject to the jurisdiction of the Court in *Lockheed Martin v. United States*, No. 00-129 C.

19. On March 29, 2006, this Court determined that Lockheed Martin could not assert the loss on the disposition of the Cray computers as an offset or an affirmative claim in *Lockheed Martin v. United States*, No. 00-129 C, without first seeking a contracting officer's final decision. *Lockheed Martin v. United States*, 70 Fed. Cl. 745, 754-58 (2006).

20. On May 31, 2006, Lockheed Martin submitted a formal claim to Mr. Justin Palmisano, the Defense Corporate Executive ("DCE"), for the recognition and reimbursement of the loss incurred by the Company on disposition of the two Cray computers in 1995. Lockheed Martin asserted a right to the sum certain amount of $4,108,250, plus interest. This sum certain amount represents the amount of Lockheed Martin's $6,810,423.94 loss on the disposition of the Cray computers that was allocable to flexibly priced government contracts at Lockheed Missiles and Space Company and Lockheed Aeronautical Systems Company, the predominant users of the Cray computers.

21. On July 24, 2006, the DCE issued the Final Decision on Lockheed Martin's claim for recognition and reimbursement of the loss incurred by the Company on disposition of two Cray computers in 1995. The Final Decision asserted that "[t]he loss on the disposition of the Cray computers sought in LMC's claims was not included in the final indirect overhead cost rate proposal for LMC's FY 1995." On the basis that "LMC's indirect cost rates for its FY 1995 are settled," and "the contractor has received final payment under many of the affected contracts" thereby releasing the Government from "all liabilities, obligations, and claims, arising out of or under the contracts," the DCE denied LMC's claim.

22. The Final Decision stated that Lockheed Martin's reservation of rights in the Settlement Agreement "was not related to any LMC claim for a loss on the disposition of any Cray computers."



648870.1

COUNT I

23. The allegations contained in paragraphs 1 through 22 are incorporated herein by reference.

24. The Settlement Agreement between Lockheed Martin and the United States Government included an express reservation that the "settlement in no way affects the dispute concerning Cray costs, which is currently being litigated . . . ." This express reservation evidences a mutual understanding between Lockheed Martin and the Government that all costs related to Cray computers, including the Company's 1995 loss on the disposition of the Cray computers, were excluded from settlement under the Settlement Agreement. Lockheed Martin is therefore entitled to $4,108,250, plus interest from May 31, 2006, for the loss on disposition of the two Cray computers in 1995.

PRAYER FOR RELIEF

WHEREFORE, for the reasons set forth above, Plaintiff Lockheed Martin prays for relief as follows:

1. The Court award Lockheed Martin $4,108,250, plus interest from May 31, 2006, for the loss on disposition of the two Cray computers in 1995.

2. That the Court award costs, attorney fees, and such other and further relief as the Court may deem just and equitable in the circumstances.

Respectfully submitted,

Angela B. Styles

Angela B. Styles
MILLER & CHEVALIER CHARTERED
655 15th Street, N.W., Suite 900
Washington, DC 20005
Tel: (202) 626-5800
Fax: (202) 628-0858

Attorney of Record for
LOCKHEED MARTIN CORPORATION

Of Counsel:

David M. Christenson, Esq.
LOCKHEED MARTIN CORPORATION
6801 Rockledge Drive
Bethesda, Maryland 20817
Tel: (301) 897-6127
Fax: (301) 897-6333

Dated: October 4, 2006

RECYCLED 90000 SERIES 30% P.C.W.

Lockheed Martin Corporation
6801 Rockledge Drive Bethesda, MD 20817
Telephone 301·897·6000

LOCKHEED MARTIN

May 31, 2006

Mr. Justin Palmisano
Defense Corporate Executive
Defense Contract Management Command
6801 Rockledge Drive
Bethesda, Maryland 20817-1877

Claim for Costs Resulting from Disposition of Cray Computers

Dear Mr. Palmisano:

Pursuant to the Contract Disputes Act ("CDA"), 41 U.S.C. § 605(a) & (c), this letter constitutes a formal claim by Lockheed Martin Corporation[1] for recognition and reimbursement of the loss incurred by the Company on disposition of two Cray computers in 1995. Lockheed Martin asserts, as a matter of contract right, a claim under the flexibly priced government contracts listed in Exhibits 10 and 12 to the sum certain amount of $4,108,250.00, plus interest from the date of receipt of this claim as provided for by 41 U.S.C. § 611. This sum certain represents the amount of Lockheed Martin's $6,810,423.94 loss on the disposition of the Cray computers allocable to flexibly priced government contracts at Lockheed Missiles and Space Company ("LMSC") and Lockheed Aeronautical Systems Company ("LASC"). A claim certification, properly executed by Joseph Giordano in his capacity as Acting Vice President, Government Financial Management, of Lockheed Martin, is attached as Exhibit 1 to this claim. Lockheed Martin requests that you promptly issue a final decision on this claim.

## I. CLAIM BACKGROUND

Lockheed Corporation formed the Lockheed Information Technology Company ("LITC") as a wholly owned subsidiary in 1992. For the purposes of achieving Corporate-wide cost savings, Lockheed centralized data processing services and information technology resources at LITC, including Cray computer resources. To support forecasted demand, LITC acquired two Cray supercomputers -- the Cray YMP-4E and the Cray YMP-8I -- with an investment value of approximately $18.2 million. The predominant users of the Cray computers were expected to be LMSC in Sunnyvale, California; LASC in

[1] "Lockheed Martin" and "the Company" will be used to refer to Lockheed Martin Corporation, as well as its subsidiaries, divisions, and predecessors, including Lockheed Corporation.

Marietta, Georgia; and Lockheed Advanced Development Company ("LADC" or "Skunk Works") in Palmdale, California. Contrary to forecasts, LADC had only minimal use for the Cray computers.

By 1995, DCAA noted that "a significant reduction in the [Cray computer] usage . . . resulted in excess computing capacity" and recommended that Lockheed Martin dispose of one or both of the Cray computers:

> We recommend that LITC reduce costs charged to Government contracts by eliminating excess computing capacity using either Scenario 2 or Scenario 3 (i.e. eliminating one or both of the Cray computers). There is no material difference in cost avoidance between the two scenarios. Therefore, the selected alternative should be based on considerations other than cost.

*See* Exhibit 2 at 5 (Draft Audit Report No. 03121-95J10501001, dated September 29, 1995). DCAA also recognized that the "sudden excess Cray Computer capacity" was due to the following factors beyond Lockheed Martin's control:

> (1) the overall decline in the defense industry, (2) changes in the method of recovering computer cost and (3) fund shortfalls in some anticipated programs.

*Id.* at 4. In direct response to DCAA's recommendation, in December 1995, Lockheed Martin sold the two computers back to Cray Research, Inc. for $170,000.[2] *See* Exhibit 3 (December 22 and 29, 1995 correspondence between LITC and Cray Research, Inc.); *see also* Exhibit 4 (October 23, 1995 letter from LITC to DCAA stating that LITC "concurs with [DCAA's] recommendation . . . [to] eliminate both Crays" and that it would do so "by year end 1995"). Because Lockheed Martin disposed of the Cray computers before the end of their normal service life, their disposition resulted in an unanticipated loss of $6,810,423.94.

By letter dated January 17, 1996, Lockheed Martin informed the Government that the Company had adopted DCAA's recommendation and disposed of the two Cray computers. *See* Exhibit 5. In an April 5, 1996 audit, DCAA affirmed Lockheed Martin's prudent business decision to sell the Cray computers:

> In our opinion, the replacement of both the Cray computers with a Cray [J916] computer will result in *annual cost avoidance of $982,000*. Our

---

[2] Simultaneous with the sale of the Cray supercomputers, Lockheed Martin purchased a smaller Cray computer (J916) to meet the remaining Cray computer needs. *See* Exhibit 3. Following the December 22, 1995 sale of the two Cray computers and pending delivery and installation of the smaller Cray, Lockheed Martin leased one of the two computers for the period December 23, 1995 through January 31, 1996 at a cost of $21,300. *See id.*

previous audit (reference Audit Report No. 3121-95J10501001) . . . disclosed that LITC could provide a more cost-effective delivery of computer services if it either disposed of the Cray YMP-4E computer or disposed of both the Cray YMP-4E and the Cray YMP-8I . . . .

*See* Exhibit 6 at 1 (italics added).

In approximately April 1995, Lockheed Martin created Enterprise Information Systems ("EIS"), a Lockheed Martin IT organization based in Orlando, Florida. All LITC operations were transitioned to EIS, including LITC books and records. The loss resulting from Lockheed Martin's December 1995 disposition of the Cray computers was transitioned from LITC to EIS and remained with EIS until May 23, 1996, when EIS used a General Ledger Journal Voucher ("JV") to transfer the January 1, 1995 opening net book value of the Cray computers to Corporate.[3] *See* Exhibit 7.

In December 2001, Lockheed Martin and the Government determined that Corporate direct and indirect costs for 1995 could be settled as part of a Final Incurred Cost Settlement Agreement even though litigation and significant disagreement existed regarding Cray computer costs. The parties agreed to close the 1995 overhead year, but they expressly reserved Lockheed Martin's right to pursue this claim. Lockheed Martin's Corporate final incurred costs settlement agreement for fiscal year 1995 provides: "This settlement in no way affects the dispute concerning Cray costs, which is currently being litigated." *See* Exhibit 9. This express reservation in the Corporate final incurred costs settlement agreement evidences the parties' intention to reserve for future disposition the final resolution of Cray costs incurred by Lockheed Martin's Corporate home office. This reservation included by Lockheed Martin and *agreed to by the Government* evidences a mutual understanding that all costs related to the Cray computers would be resolved globally and a mutual recognition that a final reconciliation of such costs would occur on an unspecified date after execution of the final incurred costs settlement agreement on December 21, 2001.

---

[3] The EIS journal transaction reflects the loss after it was reduced by $170,000, the amount that LITC received for selling the Cray computers. *See* Exhibit 7. The claimed loss has also been reduced by $632,191.50 to account for 1995 depreciation costs included in hourly billings to the operating companies, making the total loss prior to allocation $6,810,423.94 ($7,612,626.44 less $170,000 for the sale, less $632,191.50 for previously billed depreciation costs). *See id.*

## II. CLAIM CALCULATION

Lockheed Martin has calculated this claim as a Corporate indirect cost allocated to LMSC and LASC based upon actual usage of Cray computers and then allocated to contracts using the 1995 G&A pools for LMSC and LASC. The $6,810,423.94 Corporate home office loss on disposition was allocated 49% ($3,337,107.73) to LMSC and 51% ($3,473,316.21) to LASC based upon actual Cray computer usage from 1994 - 1996.[4] The loss was then allocated to contracts through the 1995 G&A pools at both LMSC and LASC. For LMSC in 1995, flexibly priced government contracts comprised 91.26% of the work. *See* Exhibit 8 at 3. Therefore, the claim allocates 91.26% of $3,337,107.73 -- $3,045,444.51 -- to LMSC's flexibly priced contracts listed in Exhibit 12. For LASC in 1995, flexibly priced contracts comprised 28% of the work. *See* Exhibit 10 at 11. Therefore, the claim allocates 28% of $3,795,733.88 -- $1,062,805.49 -- to LASC's flexibly priced contracts listed in Exhibit 10. The total claim amount of $4,108,250.00 is calculated by adding the amount allocated to flexibly priced contracts at LMSC in 1995 ($3,045,444.51) to the amount allocated to flexibly priced contracts at LASC in 1995 ($1,062,805.49).

## III. ALLOWABILITY

Because Lockheed Martin disposed of the Cray computers before the end of their normal service life, their disposition resulted in an unanticipated loss of approximately $6,810,423.94. Under FAR 31.201-2, this cost is an allowable cost because it is (1) reasonable; (2) allocable; (3) complies with the Cost Accounting Standards; and (4) complies with the specific limitations of FAR Part 31 related to a loss on disposition of a capital asset.

### A. *Reasonableness*

This loss meets the reasonableness criteria of FAR 31.201-3 because: (1) the loss is the type of cost generally recognized as ordinary and necessary for the contractor's business; (2) Lockheed Martin's disposal of the Cray computers was consistent with sound business practices; and (3) disposal of the Cray computers furthered Lockheed Martin's responsibilities to the Government because the computers were excess to the Government's needs. Indeed, the fact that DCAA recommended that Lockheed Martin dispose of the Cray computers, resulting in significant cost savings to the Government, underscores the reasonableness of the costs.

---

[4] Due to the minimal use of the Cray computers by certain other parts of Lockheed Martin, the claim allocates the loss to LMSC and LASC only.

B. *Allocability*

Pursuant to the allocability criteria of FAR 31.201-4, the Cray loss is allocable from the Lockheed Martin Corporate home office to LMSC and LASC because the Cray computers were purchased by LITC (a centralized service center) for utilization by LMSC and LASC. The benefits of the Cray computers, the cost savings achieved on disposition of the computers and also the loss on disposition was a cost appropriately borne by LMSC and LASC. The loss was "allocable to Government contracts" under FAR 31.201-4 because the costs could be distributed to LMSC and LASC "in reasonable proportion to the benefits received."

C. *Cost Accounting Standards*

Lockheed Martin's methodology for assigning and allocating the Cray loss complies with applicable CAS.

1. In accordance with CAS 403, the claim allocates the loss as a Corporate home office expense to LASC and LMSC.

The loss on the disposition of the Cray computers was moved from EIS to Corporate because the loss was a centralized service cost that was appropriately borne as a home office expense and reallocated by the Corporate home office to LASC and LMSC based upon the benefits received by LASC and LMSC. The claim calculation treats the allocation in the same manner as other direct allocations from Corporate. CAS 403 requires that home office expenses be directly allocated to individual segments where the home office incurred the expenses for the benefit of those segments. In relevant part, CAS 403 provides:

> Home office expenses shall be allocated on the basis of the beneficial or causal relationship between supporting and receiving activities. Such expenses shall be allocated directly to segments to the maximum extent practical.

48 C.F.R. § 9904.403-40(a)(1); *see also id.* § 9904.403-20(a). Pursuant to CAS 403, the $6,810,423.94 loss on the disposition of the Cray computers is a home office expense that Corporate incurred for the benefit of LMSC and LASC, and as such the loss is directly allocable to those operating companies. *See Grumman Aerospace Corp.*, ASBCA No. 23219, 1982 ASBCA LEXIS 285 at *59 (ASBCA Feb. 16, 1982) (finding that "the terms 'allocate directly' and 'identify specifically' are synonymous as used in CAS 403").

2. In accordance with CAS 409, the claim recognizes the loss in the year of disposition.

As defined by CAS, the Cray computers qualify as tangible capital assets. *See* 48 C.F.R. §§ 9904.403-30(a)(5) & 9904.409-30(a)(3) (defining a "tangible capital asset" as "an asset

that has physical substance, more than minimal value, and is expected to be held by an enterprise for continued use or possession beyond the current accounting period for the services it yields."). As tangible capital assets, the accounting, allocation and assignment related to the disposition of the Cray computers is governed by CAS 409. Judge Allegra further confirmed that CAS 409 governs Lockheed Martin's accounting for the loss:

> During the years in question, CAS 409 provided that the depreciable cost of a tangible capital asset shall be its capitalized cost less its estimated residual value. It also specified various criteria for assigning the depreciable cost of tangible capital assets to cost accounting periods and allocating such costs to cost objectives within such periods, including the proper treatment of gains and losses upon disposition of tangible capital assets. *See* 48 C.F.R. § 9904.404-40.

*Lockheed Martin Corp. v. United States*, No. 00-129C, 2006 U.S. Claims LEXIS 79 at *39 n.10 (Fed. Cl. Mar. 19, 2006). In relevant part, CAS 409-40(a)(4) provides:

> The gain or loss which is recognized upon disposition of a tangible capital asset shall be assigned to the cost accounting period in which the disposition occurs.

48 C.F.R. § 9904.409-40(a)(4). In accordance with this provision, the claim calculation appropriately recognizes the loss in 1995, the year of disposition.

3. In accordance with CAS 409, the claim allocates the Cray loss in the same manner as depreciation would have been recognized at the Corporate home office and consistent with the LASC and LMSC CAS Disclosure Statements.

Pursuant to CAS 409-40(b)(4), the loss must be allocated by Corporate in the same manner as depreciation of the asset "was" or "would have been" allocated "in the cost accounting period in which the disposition occurs." Specifically, CAS 409-40(b)(4) provides:

> The gain or loss which is recognized upon disposition of a tangible capital asset, where material in amount, shall be allocated in the same manner as the depreciation cost of the asset has been or would have been allocated for the cost accounting period in which the disposition occurs.

48 C.F.R. § 9904.409-40(b)(4).

Lockheed Martin's Corporate home office CAS Disclosure Statement in effect in 1995 did not contain a cost pool or allocation base for depreciation or loss on disposition for Cray computers. Thus, the disposition must be considered a first-time cost. The CAS

recognize that first-time costs may arise after submission of a CAS Disclosure Statement. *See* 48 C.F.R. § 9903.302-2 ("The initial adoption of a cost accounting practice for the first time a cost is incurred, . . . , is not a change in cost accounting practice"). Therefore, the claim allocates the loss from Corporate to the benefiting segments (LMSC and LASC) according to how the loss would have been allocated to the segments in 1995 "in reasonable proportion to the benefits received." The allocation base is based upon "actual usage" of the Cray computers by LMSC and LASC in 1994-1996.

Additionally, LMSC's CAS Disclosure Statement in effect in 1995 makes clear that the loss -- a loss on the disposition of two computers -- is appropriately calculated as part of LMSC's G&A pool:

> For Government Contract costing purposes, the gains or losses from all types of fixed assets dispositions *except computers* are credited or charged to the same overhead or G&A pools to which the depreciation or amortization expense had been charged. *In the case of computers*, the overhead or G&A pools are charged or credited with the gain or loss even though the depreciation is transferred to the service center. *(See Special Considerations 3.1.0 and Service Centers 4.3.0, 4.5.0 and 4.6.0).* Proceeds in excess of original book value are handled as miscellaneous income.

*See* Exhibit 11 at 37 (italics added). Consistent with LASC's CAS Disclosure Statement in effect in 1995, the loss would have been put in LASC's G&A pool because it constitutes an "[a]llocation of Corporate home office costs not assigned directly to another pool or service center."[5] *See* Exhibit 13.

D. *FAR 31.205-16 Requirements*

Finally, under the last FAR Part 31 prong for allowability, the claim calculation complies with the specific limitations of FAR 31.205-16 related to a loss on disposition of a capital asset. FAR 31.205-16 provides:

> Gains and losses from the sale, retirement, or other disposition (but see 31.205-19) of depreciable property shall be included in the year in which they occur as credits or charges to the cost grouping(s) in which the depreciation or amortization applicable to those assets was included (but see paragraph f of this section).

---

[5] Alternatively, LASC could have treated the loss on the disposition of the Cray computers as a first-time cost and included in it in the G&A pool.

Because the Cray loss was a Corporate expense allocated to LMSC and LASC in 1995 (the year of disposition) in the manner consistent with Corporate and operating segment accounting, the costs are clearly allowable costs under the FAR 31.205-16 criteria.

IV. CONCLUSION

Because Lockheed Martin's costs for the loss on the disposition of the Cray computers are reasonable and normal costs of doing business that are allowable and allocable to government contracts, the costs should be reimbursed by the Government.

Sincerely,

Joseph Giordano
Acting Vice President,
Government Financial Management
Lockheed Martin Corporation

# CERTIFICATION

I certify that this claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustments for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

Joseph Giordano
Acting Vice President,
Government Financial Management
Lockheed Martin Corporation

2

EXHIBIT 4

DENVER BRANCH OFFICE
CENTRAL REGION
DEFENSE CONTRACT AUDIT AGENCY
7115 WEST JEFFERSON AVENUE SUITE 200
LAKEWOOD CO 80235-2337

IN REPLY REFER TO

28 September 1995

Mr. Bill Bernstein
President
Lockheed Information Technology Co.
3601 Delmarto Street
Denver, CO 80221

SUBJECT: Transmittal of Draft Statement of Condition and Recommendation, Super Computer Cost Avoidance

Dear Mr. Bernstein:

Attached is the draft "Statement of Condition and Recommendation, Super Computer Cost Avoidance". Please provide your comments by 31 October 1995. We will summarize your comments in our report and include them in their entirety as an appendix.

Any questions you may have concerning our request may be addressed to Mr. Steve Thorsted, Central Region EDP Supervisory Auditor, at 303/975-3553; Mr. Larry Koppenhaver, Supervisory Auditor, at 303/969-5000 or Mr. Gary LePage, EDP Auditor, at 512/728-3296.

JAMES L. LASHBROOK
Branch Manager

Copy to:
RSA-3 (Steve Thorsted)

Enclosure:
Draft Statement of Condition and Recommendation

Audit Report No. 03121-98J10801001

STATEMENT OF CONDITION AND RECOMMENDATION
SUPER COMPUTER COST AVOIDANCE

a. Condition

LMTC's High Performance and Classified Computing facilities have experienced a significant reduction in usage that has resulted in excess computing capacity. Specifically, CPU usage on the Cray YMP - 8I has decline from an average of approximately 80 percent in 1993 to a current level of 22 percent. Dedicated CPU usage on the Cray YMP - 4E is down to almost zero usage from a 1993 level of approximately 65 percent.

The sudden excess Cray Computer capacity results from: (1) the overall decline in the defense industry, (2) changes in the method of recovering computer cost and (3) fund shortfalls in some anticipated programs.

We examined three possible scenario's for dealing with the idle capacity on the Cray computers which are:

(1) Do nothing. Continue to maintain the Cray YMP - 4E and the Cray YMP - 8I.

(2) Eliminate both Cray computers and buy any needed Cray time from a third party.

(3) Eliminate the Cray YMP - 4E and maintain the Cray YMP - 8I. The Cray YMP - 8I would continue to service internal Lockheed Martin requirements.

The analysis of these alternatives done in cooperation with LMTC is as follows:

| | PROJECTED ANNUAL COST REDUCTION | | |
|---|---|---|---|
| | Scenario 1 | Scenario 2 | Scenario 3 |
| Labor & Related-HPCC | $ - | $200,200 | $100,100 |
| Labor and Related-Operations | - | 133,800 | 46,000 |
| Hardware Maintenance | - | 387,600 | 270,000 |
| Software Maintenance | - | 226,900 | 26,400 |
| Power Consumption | - | 108,000 | 48,000 |
| Purchase of Outside Cray Time | - | (780,000) | - |
| Net Savings | $ - | $486,200 | $490,500 |

FOR OFFICIAL USE ONLY



PT 000038

Proprietary Matter

Audit Report No. 03121-95J16501002

This analysis is based on the assumptions that:

1. Approximately 2,500 hours of third party Cray hours would need to be purchased if both Cray's were to be eliminated. The estimated cost of a third party Cray hour would be $300.

2. Scenario 2, eliminating both computers, would result in a headcount reduction of two in HPCC and 1.5 in Operations. Scenario 3, eliminating one computer, would allow headcount reductions of one in HPCC and .5 in operations.

Failure to address the excess capacity problem in a timely manner could result in unneeded expenses being incurred by Lockheed and charged to the Government.

b. Recommendation

We recommend that LITC reduce costs charged to Government contracts by eliminating excess computing capacity using either Scenario 2 or Scenario 3 (i.e. eliminating one or both of the Cray Computers). There is no material difference in cost avoidance between the two scenarios. Therefore, the selected alternative should be based on considerations other than cost.

Additionally, should LITC choose to keep one Cray computer, significantly higher utilization levels should be achieved via internal Lockheed use and/or selling computer time to other Federal Government agencies or other third parties.

c. LITC's Response

d. Auditor's Comments

FOR OFFICIAL USE ONLY



PT 000039

Proprietary Matter

RECYCLED
90000 SERIES
30% P.C.W.

CRAY RESEARCH, INC.

Western Regional Office
5120 Crow Canyon Place, Suite 400, San Ramon, CA 94583 (510) [illegible]
FAX (510) [illegible]

December 29, 1995

Lockheed Information Technology Company
1401 Del Norte Street
Denver, CO 80221

Attention: Mr. William Bernstein
Vice President, Data Center Services

Subject: Lockheed letters dated December 22, 1995 (attached)

Dear Mr. Bernstein:

Enclosed are duly-executed copies of subject letters covering the purchase of a Cray J916 with related software license and maintenance services, in conjunction with the trade-in of the Cray YMP8I S/N 1710 and the XMP4E S/N 1822. Our acceptance of these letters is expressly conditioned on the following:

1. The terms and conditions of Cray Research's standard Sale, Software License and Maintenance service contracts (Cray-signed copies attached hereto) govern this transaction. The J916 equipment and software will be released for shipment only upon Lockheed's counter-execution of these contracts. The J916 is currently scheduled to be delivered on or about February 2, 1996.

2. In addition to the noted shipping costs for the J916, the noted charges for the YMP8I services, and the noted monthly charges for J916 services and license, Cray Research will issue invoices for the noted $30,000 price differential and the $8,500 UNIX Tier-2 license fee; payment by Lockheed for all invoices will be in accordance with the provisions of the above-specified contracts.

Please forward one (1) fully-executed original of each of the above contracts to me as soon as possible to allow us to schedule shipment of the J916 accordingly. Please call Carol Borella at (510) 866-0506, extension 287, or Tim Ward at (303) 702-8316, if you have any questions.

Best regards,

[signature]

Timothy F. Frank
Contracts Manager

lite1tr.doc

-97X    510 866 3024    12-29-95 02:49PM PAGE 002

Lockheed Information Technology Company
1401 Del Norte Street Denver, CO 80221
Telephone 303-430-2230 Facsimile 303-430-2225

LOCKHEED MARTIN

December 22, 1995

Cray Research, Inc.
2130 Crow Canyon Pl. Ste. 400
San Ramon, CA 94583

Lockheed Information Technology Company (LITC) agrees to sell to Cray Research, Inc. on 12/22/95 the following equipment and associated peripherals under following conditions:

<u>Equipment</u>
Cray Y-MP8I/4128 S/N 1719
Cray Y-MP4E/464 S/N 1622

<u>Conditions</u>

1. Sale of equipment $200,000
   less deinstallation/shipping ($30,000)
   Net $170,000

2. Lease of Cray Y-MP8I (S/N 1719), inclusive of hardware and software maintenance at $21,500 for the period 12/23/95-1/31/96.

Wm. Bernstein, Vice President
Data Center Services

Timothy F. Frush
Cray Research, Inc.

X-868 DEC-28-1995 12:36 510 866 6026 P.04
12-28-95 03:43PM P004 #42

Lockheed Information Technology Company
[illegible] Del [illegible] Denver, CO [illegible]
Telephone [illegible] Facsimile [illegible]

LOCKHEED MARTIN

December 22, 1995

Cray Research, Inc.
3130 Crow Canyon Pl. Ste. 400
San Ramon, CA 94583

Lockheed Information Technology Company (LITC) agrees to purchase from Cray Research, Inc. (the following purchase order number has been assigned to this acquisition LT-5772) the following equipment and associated peripherals and software under following conditions:

Equipment
Cray J916/4-2048
IOS-6
DD-10
DDS-30
EI-1
FI-6
SI-8x

Software
Fortran PE
C++ PE

Purchase price for all items above: $200,000

Unix USE-3 License $8,500

Conditions
1. LITC will pay actual shipping costs for the above equipment and software at a price not to exceed $5,000. Installation is at no cost.

2. LITC will pay hardware and software maintenance at a cost of $5,555 per month, effective 2/1/96. Delays in the shipment, delivery and installation of the above equipment will result in LITC continuing to use the leased Y-MP8I at monthly cost of $5,555.

Wm. Bernstein, Vice President
Data Center Services

Timothy F. Frush
Cray Research, Inc.

DEC-22-1995 15:25 [illegible] 12-29-95 09:43 [illegible]

RECYCLED 99000 SERIES